Good afternoon. I'm D.L. Dixon, and I represent North County Communications. This case is much about a misinterpretation of the Telecom Act by the district court. In making its determination about the case, the district court decided it needed to determine whether or not North County Communications was a local exchange carrier. Because the contract, which was a settlement agreement between the parties and a switched access agreement on a going forward basis, said that North County would be providing switched access service, and those places were also providing local exchange service. Now, the difficulty is local exchange service itself is not defined in the Act. But local exchange provider, or local exchange carrier, is defined in the Act. It's section 153, subsection 32, which defines that as any person engaged in the provision of telephone exchange service or exchange access. The district court, I'm sure you've read the opinion, focused on telephone exchange service, deciding that that term was most analogous to local exchange service. But the district court did not pay any attention to the fact that a local exchange carrier doesn't have to provide just telephone exchange service. It could provide any alternative exchange access. And the term exchange access is defined, and it says the offering, and this is in section 153 also, in section 153, telephone exchange services or facilities for the purpose of origination or termination of telephone toll services. Now, this is important because it's in the disjunctive, origination or termination. And part of the district court's order pointed out and focused on the fact that this was one-way traffic, that the calls spring sent to North County that terminated to North County. And that's permissible under this definition. And that would make North County a local exchange carrier under the Act. So I think the district court also thought that you had overcharged Sprint and therefore had breached. I'm wondering if we need to decide any of the issues you just talked about, if we think the district court was correct on the overcharge issue. I think the overcharge, it's a big number, but I don't think the size of the overcharge necessarily makes it material. Sprint also had an obligation under the agreement, which is part of the record here, to notify in a timely manner of overcharges, and that didn't occur. The overcharges can also be resolved by credits. Can I stop you about this? They didn't notify you. So as I understand it, though, they stopped paying you. And so wouldn't that be notification? That would be notification in February of 2008. Yes. So from February of 2002, six years later, February 2008, there were no disputes related to... Actually, there were. There were, and that's in the record too. There were overbilling disputes where they thought invoices were incorrect or that rates were incorrect, and those were all resolved. That was around 2004. So Sprint could have brought up the same issue and said, we're being overbilled at this point. But for those years when they didn't object in the way that you're saying they should have, they also paid you, right? Yes, they paid. So for the years that they didn't pay, they objected by not paying, or do you think they needed to object even more in some way? They objected by not paying from 2008 until May of 2010, but it wasn't until May of 2010 that they actually terminated the contract. And the settlement agreement contract has a provision that says, after the first four years, which would have been any time after February 2006, any party could terminate for no reason at all with 60 days notice. And our position has always been, when February 2008 came around, they wanted to notify North County that Sprint was no longer going to be paying, but they waited two and a half years to terminate the contract because they continued to resell the service, provide it to their customers. Customers were able to make long distance calls that terminated to a chat line, and they were able to terminate those calls without having to pay North County, where any other carrier they would have had to pay them. Why did North County use a number in Illinois associated with Leaf River, though its equipment was located in DeKalb? It's... This is uncertain in the record, too. North County tried to get facilities in the Verizon territory, and it couldn't actually get an interconnection agreement with Verizon. So it ended up going into the Leaf River territory, which is a neighboring exchange. And that's where they were able to obtain interconnection in a very quick manner, and that's where they started providing their service. It may seem kind of strange, but they were competing with Leaf River. They might have been in Verizon, they might have been in Chicago or wherever they were outside of... They're actually in DeKalb. And this is what... I'm from Illinois, that's why I was curious. I wanted to address the court's questions about the statute of limitations, and I will just try to make that as quick as possible. Obviously, statute of limitations is something that's reviewed de novo, whether or not the correct statute was used. And I think in the cases that were supplied by the court and the other cases later that cite those cases, it seems pretty clear to me that the two year statute of limitations under the Telecom Act will apply to causes of action that spring from telecom related services. And for that reason, I believe it's very clear that the FCC's two year statute of limitations under Section 415 would not be the four year California contract statute of limitation. It is a contract cause of action though, right? The counter claim? The counter claim, there are six counter claims. The first four, I believe, allege violations of the Telecom Act, 201, 202, 206, 201B. And only near the end of the counter claims is the phrase, in the alternative breach of contract. But I believe it was the Pavlik case that said, no matter how you phrase it, no matter how you dress it up, it's still a telecom issue, and the two year statute of limitations should apply. Do you contend North Country is a carrier? You said 415 applies from anything that springs from a telecommunications service, but that isn't what 415 says. It says suits against a carrier. Yes, North County is a carrier. North County Communications is a local exchange carrier. The Public Utility Commission in every state has issued certificates saying that. In 2009, and this case is also in North County's brief, in 2009, the FCC determined in the Metro PCS case that North County was a local exchange carrier and that it was providing local exchange services to its chat lines. And that decision itself from the FCC in 2009 refers specifically to the fact that North County was providing services to chat lines. What portion of the district court's order finding that you weren't a carrier is clearly erroneous? What's the sentence? The statutory interpretation to look at telephone access service and focus on this issue of subscriber? Did a subscriber pay you something? As I was just pointing out, that's only half the possibility. The possibility to be a local exchange carrier is you're also providing exchange access. And in this case, North County was giving Sprint and its wholesale customers and their end users the opportunity to terminate their calls to the numbers they dialed and they didn't receive the benefit of the bargain here. The benefit of the bargain was North County would terminate all the traffic that Sprint sent to it and... But it would terminate it with itself because North County is... It's a fully, wholly owned affiliate, HFT. Right. It's an affiliate. But if you look at the cases out of the FCC that are cited in our briefs and particularly the later decision by the FCC in its 2011 inter carrier compensation order, providing service to an affiliate is not unlawful. It's not a violation and it doesn't mean that the traffic that you terminate is not compensable. I don't think the district court found that it was unlawful. It just found that it was dealing with itself. It was nothing other than itself. But I don't think... I don't think that they followed what the FCC had said about dealing with yourself or dealing with an affiliate in the CLEC access reform orders or in the 2011 order. I think the district court was wrong to determine that the two companies are simply one in the same. And those cases that we cite from the FCC make it clear that they're not the same company and you can terminate that traffic and you can get compensation for that. Could I take you back to the counterclaim statute of limitations issue? So as I understand it, the district court thought that it was a state law contract cause of action that was at issue in the counterclaim, but said that the agreement expressly subjects interpretation and enforcement to the Communication Act's rules. I'm trying to figure out if that was correct because I'm not sure that the agreement is so clear that it should be the Communications Act instead of California law. It has provisions for both and it doesn't say which one trumps the other. I would argue that the end result was the correct result. The rationale getting there was not the correct rationale. So where did the district court go awry? How do you get there a different way than the district court did? To get to the two year statute of limitations. I support the two year statute of limitations. Right, I know, but so how do you get there? You said the reasoning was wrong, but you get the same result. So how do you get there? I believe part of the reasoning was wrong simply because there was a confusion of whether or not state law controlled or whether the Telecom Act controlled. And I think the cases, the Pavlik case, the MFS case, there are a couple other cases that have come after those. Those make it very clear that if it walks like a duck and quacks like a duck, it's a duck and the two year statute of limitations at the FCC is going to apply. But why is this... Can you make a counterclaim under the Communications Act instead of a counterclaim under California contract law? Because it's an overbilling issue. But it's overbilling based on the contract, right? I mean, based on reading the agreement and whether the terms were complied with? And I would imagine that the district court would say that it determined the contract didn't apply to any of these calls. I think the contract should apply to the calls and the two year statute of limitations for the Federal Act would probably apply as a statute of limitations if you wanna go back in time. Under these cases, if North County had filed this two years after it was filed, it would have been dismissed because it didn't meet the... Even though it was a separate contract, it didn't meet the requirements under 415. I would like to reserve just a couple of minutes for rebuttal. Thank you. Good afternoon, may it please the court. My name is Phil Shankenberg and I'm here on behalf of Sprint Communications Company. I'd like to start with something Mr. Dixon just said, which was if North County had filed their action, its action, it would have been subject to a two year statute of limitations. And in that context, I want to address the MFS international case that you asked the parties to address on the statute of limitations issue. This was... MFS is a very strict filed rate doctrine case that says a claim that arises under a contract slash tariff is a tariff claim. And that's a sound analysis. But this wasn't a tariff claim. The position of North County at the time that it filed its second amendment complaint in 2011, all the way through until what I think Mr. Dixon said two minutes ago, was that the tariff had nothing to do with this case. And a document, ECF document 285, is plaintiff's trial brief. And on page five, I think there's a statement that says, quote, NCC's FCC tariff played no role in the provision of services under the service agreement. And what that means is this is not a claim to enforce a tariff. The billing party disclaimed all reliance on a tariff and pounded its hands on the table time after time and said, this is a contract claim. If this had been a filed rate doctrine case, we'd have won this case years ago. North County Communications FCC tariff, filed in 2003 and in effect, I should say, on file with the FCC until 2010, was rendered void and unenforceable by Judge Battaglia in the companion Verizon case in September of 2012. NCC had no tariff. In addition, at some point during the dispute period here, and this isn't really called out in the briefs or the order, but North County transferred its authorizations to do business and its network to its affiliates. And that's when Judge Benjavengo refers to providing local service through affiliates. And so query in that case, whether there's an ability to even talk about filed rate doctrine cases when you've got, at that point, a carrier, not even a carrier, an entity who's a biller, but not even a telecom carrier, because it's transferred its authorizations to affiliates, whether filed rate doctrine cases could apply. Now, we did argue that the filed rate doctrine prevented North County from pursuing its claims in the absence of a valid tariff. That was an issue teed up for the Federal Communications Commission when this case was referred for a period of time. But Judge Benjavengo severed the contract claims, our counterclaim, and the defenses and said, we're gonna try these as contract claims. And so when a Federal District Court judge says, try a contract case, we tried a contract case. And we were fairly confident that we could win that, because the contract stated very clearly that North County had to provide local exchange service. That's in... So I have a question about this, though. They never changed what they were doing, did they? But for a long time, you paid, and even you entered the contract using this language knowing what their business was, is that right? Yes, there is certainly testimony on the record that at the time that the contract was entered, that the dispute that the parties were having at that time was a different kind of dispute. It wasn't over whether HFT was a bona fide end user, it was over rates. So certainly there is such testimony. But what the District Court did was, under California's parole evidence rule, recognized ambiguities in this contract. It required North County to provide... I'm sorry, it applied only in areas where North County was providing local exchange service, not operating as a local exchange carrier, which is an important distinction compared to what Mr. Dixon was talking about. And so what the District Court did was, took that phrase, was informed by Mr. Lesser's testimony about what he understood the contract to mean, the kinds of testimony that you're talking about, Your Honor. And she was also informed by testimony from Sprint's witnesses and testimony from an expert who testified about what an access agreement is and how it's used in the industry. How it differs from other kinds of telecommunications contracts. And gave testimony that custom and usage in this particular industry would lead one to believe that the phrase, local exchange service, would require, when interpreting the contract, to go back to the... Essentially the federal regulatory regime regarding how and when access charges get applied, as well as state law regarding what you have to do to provide local exchange service. What didn't Sprint get that it thought it was supposed to get under the agreement? North County never terminated any calls to local exchange service customers. And under the federal regulatory regime... Not quite the question I asked. Sprint entered into this agreement after it had been engaged in business of some kind with North County. I don't see how North County's business changed at all. North County, it appears, did provide the service it said it would provide and had provided before. What expectation did Sprint have that it would get any more than it had previously gotten? And how did Sprint lose out because of that? I apologize for interrupting. Sprint's expectation in signing this agreement was that if it was gonna have to pay regulated charges, those regulated charges were going to be for calls that met the requirements of the regulatory regime. The tariff regime allows entities who are regulated, in certain circumstances, to force their rates on those making calls. If you don't follow the rules, if they're not the right kind of calls, those regulated charges don't apply. This is, again, some of these issues were described and discussed by Mr. Wood, our expert. Pages 465 of the transcript through about 550, I think, are very helpful to see what the court was listening to and the dialogue she had with our witness on these points. Is the issue that farmers was decided and that changed Sprint's understanding of what this contract meant? Your Honor, the testimony was traffic pumping or access stimulation, which became a very significant initiative, both with Sprint and other long distance carriers, started to become... Started to bubble to the service in 2007 and 2008. And then the farmer's decision in 2009 certainly gave guidance that hadn't been there before. But it's no surprise when you have a big company that pays billions of dollars a year in these kinds of charges, that the company is going to do its best to try to focus on overbillings that are significant and material. Ms. Clouser, Sprint's witness, testified that her work on over 100 of these traffic pumping or access stimulation cases helped save the country. Mr. Lesser may have been doing this for a long time, and he may have been doing it under the radar, and then it wasn't under the radar anymore for various reasons that were described by Sprint's witnesses. Sprint invoked its right to challenge. And the findings of the district court that are not clearly erroneous, and for which there's no basis to find they're clearly erroneous, is that North County didn't do that which it was required to do under the contract as required by California law, if you're going to enforce a contract. And in a couple of respects, North County never provided a reasonably acceptable bill, even if they provided service, local exchange service, to an end user. They never provided a reasonably acceptable bill. Is your counterclaim based on the lack of reasonably acceptable bills, or is it based on them not providing the service? It's based on them billing Sprint for amounts that weren't authorized by the contract. So is that about the lack of the local service? We tried it both ways. We certainly alleged in the pretrial order and proved, put on a case to prove, that not only did North County breach the contract by providing, I'm sorry, for non-compensable services, because HFT was not a bonafide end user of a local exchange service, but also that even assuming HFT was a bonafide end user, we could take that, all of these telecom issues out. And they still provide, they still build over the cap that Mr. Lesser agreed he was subject to by an amount of $1.67 million over the course of this dispute period. That's material. It's I think cases you could cite or have cited, the ones you cited I didn't find, that suggests that over billing can be so material a breach is to justify non-payment even for the services that were provided and might have been properly billed. We did not cite any cases and I don't have any such cases. That question is only relevant in the event that you reverse the district court as to whether North County provided local exchange services. There are alternative routes, I understand that, but you've offered up over billing as one route and I understand the theory of it, but I haven't encountered before, now maybe because the over building is unusual here, but I haven't encountered before a case where a court has said because the proper charges. And our answer to that would be there weren't any proper charges and if the court had found that there were some proper charges, then we might have had that question raised as to, and it would be up for the judge to decide if there, if this was local exchange service but there was over billing. Let's explore that because if suppose, suppose North County didn't exist, Sprint was still going to have to get the calls presumably through, I don't know, the incumbent. Who's the incumbent? There's a pack belt. Whoever the incumbent local exchange would be, presumably that entity would be entitled to a fee for making that last connection between Sprint and the phone number that was dialed. Your Honor, that's not correct because if NCC didn't exist and HFT wouldn't exist and we wouldn't have this, this traffic pumping access stimulation calls to adult chat lines, they just wouldn't have existed. Well the calls would, assume the call, the adult chat line business operates on its own. How do the calls made by people to that number ultimately make it to the adult chat line participant? They would go through an incumbent carrier perhaps and then a competitive carrier and then onto the chat line and the problem is that this business practice is built around a relationship between telephone company and chat line company or conference line company in which they have to be business partners for this venture to work because telephone company built along this distance industry and they split the profits to fund the venture and the problem is and it's been shown time after time in Northern Valley case, in the the case in South Dakota evolving Native American telecom that I think we put in a rule 28 letter or I'm sorry maybe we put in our brief that in that instance where you're doing business together and you're not a common carriers customer. This is far different from what the reason we have regulation of these kinds of utilities which is to provide service to the restaurant that you would have a situation in which the traffic pumper chat line would be receiving a call and would be a traditional end-user. It may be out there, it may be happening but it certainly wasn't happening. I confess I'm not sufficiently familiar with adult chat lines but is it is are the phone calls are the fees collected by their partner the only way they're receiving revenue? I'd assume they were selling services in some other fashion too. What is interesting about this business venture is these are numbers in California and Oregon and Illinois not 800 numbers. It's a local number it's not like I'm being charged it's not a it's not an 8-8 whatever them but and you don't pay a fee for using the chat line for the time per minute or something? No. And that's why this business relationship is so important and it's the business relationship that undermines the ability to charge under the regulatory regime. Gotta spend more time on chat lines. Let me just respond to one question or one point that Judge Clifton made and it relates to DeKalb and Leaf River. The question is not whether North County Communications own equipment switching equipment is in DeKalb. The question is whether it's customer is in DeKalb and in this case HFT's equipment was in DeKalb. If HFT's equipment had been in Leaf River we might have had a different result but it's the fact that HFT's equipment was in DeKalb that makes the difference here. I'll take you over time to ask about the response. It seemed to me it was likely driven by the fact that Leaf River's local exchange could charge a higher rate as a rural local exchange but the explanation being offered up and there was a reference to it being in the record someplace was that Verizon wouldn't enter into an interconnection agreement. I've had some prior cases but we've gone beyond my expertise here. What do you have to say about that explanation as to why Leaf River number was used? I don't recall that being in the record but it certainly may be. That wouldn't prohibit HFT's equipment from being physically located in Leaf River. Well but we know it wasn't. But we know it wasn't so that the answer that it was a Verizon problem that required HFT's conference bridge to be in DeKalb instead of physically located within the Leaf River exchange does not hold up. Thank you. Thank you. I'd like to address two quick points. There may be a question about because I saw the look of surprise that nobody pays for this. Yes I would like to know if you agree with his description of the business model. There are different business models for this business model. One is to provide it by through an affiliate to one's own affiliate. The other and these are the farmers Northern Valley in several other cases. Chatline company exists solely by itself and then enters into a revenue sharing arrangement with the local exchange carrier. But so does your client make money only through the telephone charges or do you charge like a membership? No there's there's no membership fee. There's advertising revenue for the whole time that they get from sponsors. But the rest of the money for these calls would be made from the switched access service for terminating. One thing I wanted to address was the question about a case that says you get the service for free and in North County's opening brief there is a reference to an FCC decision called America's Choice and it's 11 FCC record 22494 in paragraph 24. And the FCC says that a purchaser of telecommunication services is not absolved from paying for services rendered solely because the services furnished were not properly tariffed. And I think the same could apply here. We're not talking about tariff services but we are talking about a billing mistake or in the case of a mistake there might be other things that could be wrong based on what your tariff says. But your claim all along was that the billing was wrong through the contract or they should have been paying you under the contract not under the tariff right? That the that the contract set forth what those rates would be and only for state calls did those rates refer to a tariff. Otherwise you simply referred to the FCC's 2001 CELAC access reform order as the benchmark. Meaning North County could only charge what the incumbent local exchange carrier charged in that same area. But I mean you're are you you sued them because they weren't paying you and you said under the contract they have to pay us. Under the contract in the contract the pricing just the pricing was based on federal regulations and principles. Thank you counsel. Thanks both sides for the helpful arguments. The case is submitted and we're adjourned for the day.
judges: Clifton, Friedland, Rice